# INGA L. PARSONS
### CHRISTIAN URBANO*
**(of Counsel)**

| | | |
|---|---|---|
| Admitted to MA* NY WY | **Attorneys at Law** | Tel: 781-581-2262 |
| Federal Courts | **3 Bessom St. No. 234** | Fax: 888-406-9538 |
| U.S. Supreme Court | **Marblehead, MA  01945** | Cell: 781-910-1523 |

**Inga@IngaParsonsLaw.com**                                                                **Christian@IngaParsonsLaw.com**

BY ECF

July 3, 2017

Hon. Alison J. Nathan
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY  10007

Re:  *USA v Oral Watson* 16-cr-059 (AJN)

Dear Judge Nathan:

Marvin Schechter and I are counsel for Oral Watson.  We submit this letter in aid of a fair and just sentence for Mr. Watson scheduled to appear for sentencing before Your Honor on July 14, 2017, including providing relevant facts to sentencing and an analysis of the factors under 18 U.S.C. § 3553(a) in support of a sentence of five years – the mandatory minimum in this case.

## SENTENCING LAW

This Court is obviously well aware of the federal law applicable to sentencing.  The defense would just highlight some of the most important general guiding principle that 18 U.S.C. § 3553(a) requires sentencing courts to "impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph 2."  This is known as the "parsimony" principle and is an "overarching instruction" of application of 18 U.S.C. § 3553 as described by the

Hon. Alison J. Nathan                                                                                          July 3, 2017
<u>U.S. v. Oral Watson</u> 16 cr. 059                                                                      Page 2 of 16

United States Supreme Court in *Kimbrough v. United States,* 128 S.Ct. 558, 563 (2007); *see also, United States v. Rodriguez*, 527 F.3d 221, 223 (1st Cir. 2008) (noting that the § 3553(b) factors are more than a laundry list of matters to be considered but comprise a "tapestry of factors, through which runs an overarching principle," the court's duty "to construct a sentence that is minimally sufficient to achieve the broad goals of sentencing.")

Section 3553(a)(2) states that such purposes are:

A.   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

B.   to afford adequate deterrence to criminal conduct;

C.   to protect the public from further crimes of the defendant; and

D.   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

§ 3553(a) further directs sentencing courts to consider the Federal Sentencing Guidelines in addition to such diverse and individualized factors as the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwanted sentencing disparities. 18 U.S.C. § 3553(a)(1)-(7). The following analysis is provided in support of a sentence of five years.

## BACKGROUND

### [(1)(a)(1) History and Characteristics of the Defendant]

Hon. Alison J. Nathan                                                                                          July 3, 2017
<u>U.S. v. Oral Watson</u> 16 cr. 059                                                                          Page 3 of 16

Oral was born in the West Indies but has been in this country since he was seven growing up in a rough section of Paterson, New Jersey. (PSR ¶ 61-2, 65). Paterson, New Jersey has one of the highest violent crime rates in the United States across communities of all sizes (both large and small) and that does not even include the drug business. *See https://www.neighborhoodscout.com.* Oral is a now a United States citizen and is not subject to removal. (PSR ¶ 65). He managed to avoid gangs but not the call of easy money with drugs; the commerce of his community.

Although he has engaged in criminal behavior, Oral has also managed to build a legitimate business--Wow Ventures, Inc--doing repairs and landscaping of managed properties. (PSR ¶ 78). The ability to continue that business (it is currently being run by his fiancée) can assist Oral in maintaining a crime free future.

Despite the use of criminal means to earn a living off and on in his past, Oral's background shows many silver linings of goodness and hope. I offer as an example the letter from Francis Eiley which is attached as a reference letter. Counsel knew nothing of Francis Eiley as it was not something that Oral had disclosed as part of the report. Mr. Eiley sent a letter in which he explains how his son has a rare condition called Congenital Adrenal Hyperplasia (CAH). The Eileys live in a third world country with limited access to health care. As a result, Elijah's legs have not developed correctly. Oral spearheaded a fundraiser to assist in raising almost $4,000 for the purchase of custom braces for Elijah. Oral

Hon. Alison J. Nathan  July 3, 2017
<u>U.S. v. Oral Watson</u> 16 cr. 059  Page 4 of 16

developed an extremely close relationship with Elijah giving him his first tackle box and taking him on many fishing trips.   Oral would bring bakery goods for the kids in the neighborhood in Central America.  Mr Eiley asks for this Court's mercy on behalf of Oral.

Also attached as Exhibit A are letters from people in New Jersey and California who can attest to Oral's work ethic, professionalism and responsibility. There are also letters that touch on Oral's commitment to his son.  Ronald Williams describes Oral's relationship with his son and Oral's desire to give his son a quality education. "Oral is a great father who is committed to raising his son to be an upstanding figure within the community."  In Mr. Williams' words "It would be a true tragedy to keep him separated from being involved in the development of his young son Omari…..Allow Mr. Watson a speedy release so that he may…develop and guide [ ] his son Omari during this impressionable time in his life."  Pastor Enid Wallace has known Oral for several years as a God fearing man who is now doing what is right.  "As he goes before you, as the judge, I trust that he will respect the God in you to tell the truth in the matter.

Oral has submitted his own letter describing the remorse and understanding he now has having been exposed to the draconian federal sentencing guidelines and realizing that he absolutely must, in his words, "It must stop.  This case will be my last.  Whatever I could do to make a difference and show the judge that commitment I endeavored to do.  I will come before this Court more remorseful than I thought I could ever feel." *See* Exhibit B.

Hon. Alison J. Nathan  July 3, 2017
<u>U.S. v. Oral Watson</u> 16 cr. 059  Page 5 of 16

# DETERRENCE AND RECIDIVISM

## [(2)(B) to Afford Adequate Deterrence; 2)(C) To Protect the Public From Further Crimes By the Defendant]

Oral's strong family bonds (soon to become even stronger with the birth of a daughter) provide additional confidence that he will not come before this Court again. Studies using theoretical perspectives which focus on the positive roles and functions that families serve (as opposed to the problems that they experience) indicate that "families are important to prisoners and to the achievement of major social goals, including the prevention of recidivism and delinquency." Hariston, et. al., *From Prison to Home: The Effect of Incarceration and Reentry on Children, Families, and Communities. Prisoners and Families: Parenting Issues During Incarceration* (Dec. 2001) http://aspe.hhs.gov/hsp/prison2home02/Hairston.htm.

According to Hariston, a "review of research on prisoners' family relationships yielded two consistent findings; male prisoners who maintain strong family ties during imprisonment have higher rates of post release success than those who do not and men who assume responsible husband and parenting roles upon release have higher rates of success than those who do not." *Id*.

It is ironic (and sad) that much of what compelled Oral's actions in this case was the desire to give more to his family, in particular his son, however, he acutely understands that this cannot be his future. It has jeopardized his ability to be a father to his son at a crucial time in his 11-year old boy's life, and it

Offices: 50 Congress Street Suite 600 Boston MA 02109 * 1790 Broadway Suite 710 New York NY 10019

Hon. Alison J. Nathan                                                                              July 3, 2017
<u>U.S. v. Oral Watson</u> 16 cr. 059                                                        Page 6 of 16

jeopardizes the future of his ability to bond and be a father to his soon to be born baby girl.

The good news is that Oral has demonstrated acute remorse and is now dedicated to achieving a crime free existence to be the true role model his son and daughter will need. Oral describes his actions including using his time on bail to get his affairs in order and mitigate the impact of his upcoming imprisonment on his respectfully requests leniency from this Court.

### **MEDICAL CONCERNS**

**[(2)(D) To Provide the Defendant with Needed Educational or Vocational Training, Medical Care or Other Correctional Treatment in the Most Effective Manner]**

Oral has admitted to having used marijuana regularly and has also had difficulties with alcohol. *See* PSR at ¶ 74-5. Oral has not received the benefit of substance abuse treatment and respectfully asks this Court to recommend entry and completion of the RDAP program to the Bureau of Prisons. *See* PSR at ¶ 76.

Oral also has admitted to a gambling problem and is prepared to undergo treatment for that gambling. (PSR ¶ 73). His gambling problem also fueled his need for cash and was fueled by Oral's family responsibilities. For example, he lost $25,000 to $30,000 just over a couple of trips. *Id.* He admits to having a problem. *Id.*

Until the 1980s, compulsive gambling was typically viewed as a moral failing. George Washington's words were often invoked: "gambling is the child of

Hon. Alison J. Nathan  July 3, 2017
*U.S. v. Oral Watson* 16 cr. 059  Page 7 of 16

avarice . . . and the father of mischief." Letter of Jan. 15, 1783, quoted in American Heritage Dictionary of Questions 207. Freudians believed that compulsive gamblers lusted for punishment, knowing that losing was guaranteed by the game's unfavorable odds. *See* E. Bergler, The Psychology of Gambling (1954).[1]  In 1980, the American Psychiatric Association ("APA") recognized pathological gambling as a mental disorder, classifying it as an "impulse control disorder." *See* APA Diagnostic and Statistical Manual of Mental Disorders 324 (3d ed. 1980) ("DSM-III"). In 2013, the APA reclassified it as an addiction-related disorder, reflecting the substantial body of research showing that pathological gambling and substance addiction affect similar areas of the brain in similar ways. *See* DSM-5 at 585 (5th ed. 2013).

A recent article reports:

> Brain imaging and neurochemical tests have made a "pretty strong case that [gambling] activates the reward system in much the same way that a drug does.". . . . Gamblers report craving and highs in response to their stimulus of choice. . . . Research has shown that problem casino gamblers show increases in heart rate and salivary stress hormones as well as blood levels of norepinephrine compared with non-problem gamblers. The former also show increases in dopamine, the key player in the brain's "reward circuit." [Moreover,] brain-imaging studies show that when exposed to gambling videos, problem gamblers' brains show "important similarities" to changes in the brains of cocaine addicts when viewing a video about cocaine.

C. Holden, *Behavior Addictions Debut in Proposed DSM-V*, SCIENCE, February 2010 at 935; *see generally Nat. Ctr. for Responsible Gaming, Gambling and the*

---

[1] Defense counsel gratefully acknowledges the assistance of the defense sentencing memorandum in the *Caspersen* case as providing essential information on gambling in the context of a federal sentence which is set forth herein.

Offices: 50 Congress Street Suite 600 Boston MA 02109 * 1790 Broadway Suite 710 New York NY 10019

*Brain: Why Neuroscience Research is Vital to Gambling Research* (2011).

In short, pathological gambling "has been conceptualized as an 'addiction without the drug.'" The DSM-5 defines gambling disorder as "persistent and recurrent problematic gambling behavior leading to clinically significant impairment or distress." Among its characteristics are: (i) preoccupation with gambling; (ii) chasing one's losses (gambling more money on more risky bets in an effort to recoup losses); (iii) lying to conceal the extent of gambling; (iv) jeopardizing one's job or career opportunity; and (v) relying on others to provide money to relieve desperate financial situations caused by gambling. *Id.* The authors write as follows:

> The essential feature of gambling disorder is persistent and recurrent maladaptive gambling behavior that disrupts personal, family, and/or vocational pursuits . . . . A pattern of "chasing one's losses" may develop, with an urgent need to keep gambling (often with the placing of larger bets or the taking of greater risks) to undo a loss or series of losses . . . . Although many gamblers may "chase" for short periods of time, it is the frequent, and often long-term, "chase" that is characteristic of gambling disorder . . . . Individuals may lie to family members, therapists, or others to conceal the extent of involvement with gambling; these instances of deceit may also include, but are not limited to, covering up illegal behaviors such as forgery, fraud, theft, or embezzlement to obtain money with which to gamble . . . . Individuals may also engage in "bailout" behavior, turning to family or others for help with a desperate financial situation that was caused by gambling.

*Id.* at 586.

Gambling patterns "may be regular or episodic and gambling disorders can be persistent or in remission," but are typically a progressive disease. *Id*. at 587. Prior to November 1, 2003, several courts found that "a pathological gambling disorder, if proven . . . to have resulted in a significantly reduced mental

capacity contributing to the commission of the offense of conviction, [could] qualify . . . as a form of 'diminished capacity' under §5K2.13," and warrant a downward departure. *United States v. Harris*, 1994 WL 683429, at *4 (S.D.N.Y. Dec. 6, 1994) (collecting cases). *Accord, United States v. Liu*, 267 F.Supp. 2d 371, 375 (E.D.N.Y. 2003) (granting a downward departure, "leading to imposition of the minimum sentence permitted," based on defendant's pathological gambling addiction, which "interfered with [his] ability to control behavior that he knew was wrongful"); *United States v. Checoura*, 176 F. Supp. 2d 310, 314 (D. N.J. 2001) (granting downward departure to compulsive gambler and noting that the defendant "did not choose to gamble compulsively, any more than other compulsives choose . . . to wash their hands after touching every doorknob").In late 2003, without explanation, the Sentencing Commission issued a policy statement that "[a]ddiction to gambling is not a reason for a downward departure." U.S.S.G.§5H1.4.

The policy statement was a response to the PROTECT Act, in which Congress directed the Commission "to ensure that the incidence of downward departures [was] substantially reduced." Appendix C, amendment 651. The Act was widely criticized for "shuck[ing] the wisdom . . . and breadth of experience accumulated by judges" in fashioning individualized sentences. *United States v. Mellert*, 2003 WL 22025007, at *2 (N.D. Cal. July 30, 2003); *see also* J. Martin, Jr., *Let Judges Do Their Jobs*, N.Y. TIMES, June 24, 2003, (describing the Act as "completely at odds with the sentencing philosophy that has been a hallmark of

the American system of justice").

After *Booker*, §5H1.4's policy statement is not binding on a sentencing judge.*See United States v. Jones*, 460 F.3d 191, 194 (2d Cir. 2006)("the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines ranges themselves"); K. Stith, *The Arc of the Pendulum: Judges, Prosecutors and the Exercise of Discretion*, 117 Yale L.J. 1420, 1482-83 (2008)(*Booker* "transmuted from 'law' to 'advice' all of the departure-reducing Guidelines amendments that the Sentencing Commission had promulgated pursuant to the [PROTECT Act]"). Section 5H1.4 is especially unworthy of deference because it was not the product of expert consideration. *See Kimbrough v. United States,* 552 U.S. 85, 109 (2007) (where the Commission "did not take account of 'empirical data and national experience,'" the Guidelines should command little respect). A leading post-*Booker* compulsive gambling case is *United States v. Dikiara,* 50 F. Supp. 3d 1029 (E.D. Wis. 2014). There, the defendant embezzled more than $1 million from her employer and "gambled away virtually all of the proceeds of her crime at [a] casino." *Id.* at 1030; *see also id*. at 1031-32 ("[w]hat began as stress relief soon grew into an addiction"; the defendant "kept thinking she would eventually win enough to pay back the money she had taken").

Although the guideline range in *Dikiara* was 41 to 51 months, the court sentenced the defendant to 15 months' imprisonment, principally on the basis of her gambling addiction. The defendant's compulsive gambling, the court

observed, by "physically hijacking the brain, [had] diminishe[d] [her] capacity to evaluate and control . . . her behaviors." *Id., quoting United States v. Hendrickson*, 25 F. Supp. 3d 1166, 1174 (N.D. Iowa 2014). "Rather than rationally assessing the costs of [her] actions, [the defendant] . . . [had] act[ed] impulsively, without accurately weighing future consequences." *Id.* A variance for compulsive gambling is now not only permissible but "consonant with the compassion and humanitarianism which must always characterize the American system of justice." L. Lustberg, *Sentencing the Sick: Compulsive Gambling*, 2 Seton Hall J. Sport L. 51, 76 (1992).

In the *Caspersen* case, Andrew Caspersen faced guidelines well over life imprisonment due to the extent of the Ponzi scheme involved. According to news reports, at one point, Caspersen made so much money that he could have paid back all the money he stole and still have $50 million left over. *Id.* His victims included his own mother and parents of an ex-girlfriend who died in the 9/11 attacks. *Id.* Judge Rakoff sentenced Andrew Caspersen to four years after he pled guilty in a $38 million fraud case where he revealed a gambling addiction. The Court advised that "No purpose will be served by letting [Caspersen] rot in prison for years on end." http://www.nydailynews.com/new-york/manhattan/gambling-addict-financier-caspersen-years-38m-fraud-article-1.2858919.

In this case, the mandatory minimum of five years is sufficient but not greater than necessary to achieve the purposes of sentencing including considering Oral's gambling problem and the need for drug and alcohol treatment.

**GUIDELINES**

**[(3) The Kinds of Sentences and (4) the Applicable Sentencing Range Under the Guidelines, and (5) Any Pertinent Policy Statements]**

In *Nelson v. United* States, 129 S.Ct. 890 (2009), a summary *per curium,* decision, the United States Supreme Court explained that the guidelines enjoy no special place in the range of circumstances. "Our cases do not allow sentencing court to presume that a sentence within the Applicable Guidelines range is reasonable." *Id.* at 892. The Supreme Court made the same point in *Rita v. United States*, 551 U.S. 338 (200&) as well as in *Gall v. United States*, 552 U.S. 38, 49-50 (2007) (although it is "starting point and the initial benchmark" for constructing a sentencing, the sentencing court "may not presume that the Guidelines range is reasonable.").

As the Supreme Court confirmed in *United States v. Gall*, the Guidelines are not the sole, nor even the first among factors that Congress has commanded the courts to apply in section 3553(a). The Court "may not presume that the Guidelines range is reasonable" and "must make an individualized assessment based on the facts presented." *Id.* Indeed, "the Guidelines are only one of the factors to consider . . . and 3553(a) directs the judge to consider sentences other than imprisonment." *Id.*

Specifically, this Court must "consider every convicted person as an individual[,] and every case as a unique study in the human failing that sometimes mitigate, sometimes magnify, the crime and the punishment." *Gall*, 552 U.S. at

52 (quoting *Koon v. United States,* 518 U.S. 81, 113 (1996)).  Particularly in light of *Gall* and *Kimbrough v. United States*, 2007 WL 4292040 this Court should decline to give a guideline sentence where, as here, it is such a poor "fit" for the circumstances of the offense and characteristics of the offender.  As the Second Circuit advised in *United States v. Cavera,* 550 F.3d 180 (2d Cir. 2008): "It is now, however, emphatically clear that the Guidelines are guidelines-that is, they are truly advisory. A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense. District judges are, as a result, generally free to impose sentences outside the recommended range."

### [(6)  The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Engaged in Similar Conduct]

A sentence of 60 months imprisonment would actually be above the mean and median sentence for drug trafficking in the Second Circuit and the Southern District of New York.  *See* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2015/2c15.pdf.  The mean sentence for drug trafficking in 2015 (the most recent data) in the Second Circuit was 56 months. *Id.*  The median sentence for drug trafficking was 41 months. *Id.*  The national median sentence was 57 months. *Id.*  In the Southern District of New York, the mean sentence was 58 months and the median

Hon. Alison J. Nathan    July 3, 2017
<u>U.S. v. Oral Watson</u> 16 cr. 059    Page 14 of 16

sentence was 48 months. *See* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2015/nys15.pdf.  A sentence of 60 months would be above both of those sentences, such that a sentence within the guideline range of 87 to 108 months calculated here would result in a sentencing disparity in both the Second Circuit, the Southern District of New York and the National statistics for a case that is in every way a garden variety drug offense.

A sentence of 60 months would further the purposes of sentencing and reduce the amount of time yet another black man must spend in prison.  The *New York Times* described how there are 1.5 million "missing" black men in America. "They are missing, largely because of early deaths or because they are behind bars. Remarkably, black women who are 25 to 54 and not in jail outnumber black men in that category by 1.5 million, according to an Upshot analysis. For every 100 black women in this age group living outside of jail, there are only 83 black men. Among whites, the equivalent number is 99, nearly parity." http://www.nytimes.com/interactive/2015/04/20/upshot/ missing-black-men.html?_r=4&abt=0002&abg=0.

The article goes on to explain how "African-American men have long been more likely to be locked up and more likely to die young, but the scale of the combined toll is nonetheless jarring. It is a measure of the deep disparities that continue to afflict black men — disparities being debated after a recent spate of killings by the police — and the gender gap is itself a further cause of social ills, leaving many communities without

Hon. Alison J. Nathan                                                                                           July 3, 2017
*U.S. v. Oral Watson* 16 cr. 059                                                                           Page 15 of 16

enough men to be fathers and husbands. Perhaps the starkest description of the situation is this: More than one out of every six black men who today should be between 25 and 54 years old have disappeared from daily life." *Id.* It should be added that according to the United States Sentencing Commission's Quick Facts, "[n]early sixty percent of career offenders were Black (59.7%) followed by White (21.6%), Hispanic (16.0%), and Other Races (2.7%)." The NAACP reports that African Americans constitute nearly 1 million of the total 2.3 million incarcerated and are incarcerated at nearly six times the rate of whites.  http://www.naacp.org/criminal-justice-fact-sheet/.

This is not to say that Oral is not responsible for his actions in this offense. As this Court is well aware, he has taken full responsibility and extraordinarily accepted responsibility at the outset of this case. It is to say that 60 months imprisonment is enough given all of the circumstances set forth in this letter and now known to the Court.

**CONCLUSION**

For the foregoing reason, the defense respectfully requests that this Court sentence Oral Watson to: 1) 60 months in prison (the five year mandatory minimum); 2) recommend that he serve his sentence near his fiancée and soon to be baby daughter in California; 3) to the extent possible let him surrender voluntarily to the U.S. Marshals service (even if it is the day of his sentencing) which would significantly improve Oral's BOP calculations and assist him in attending a lower level facility; 4) recommend that Oral receive substance abuse

Offices: 50 Congress Street Suite 600 Boston MA 02109 * 1790 Broadway Suite 710 New York NY 10019

Hon. Alison J. Nathan                                              July 3, 2017
<u>U.S. v. Oral Watson</u> 16 cr. 059                                  Page 16 of 16

treatment including the RDAP BOP program; and 5) as recommended by probation, that no fine be imposed. (PSR ¶ 84).

                                                Respectfully,

                                                /s/ *Inga L. Parsons*

                                                Inga L. Parsons

Cc:    AUSA Gina Castellano
        USPO Simone Belgrave

## CERTIFICATE OF SERVICE

      I hereby certify that the foregoing was served on the 4th day of July, 2017 upon the following by ECF/CM delivery:

                                                /s/   *Inga L. Parsons*
                                                Inga L. Parsons